kaw

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| WILLIAM O. REED, JR., MD, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>PHILLIP ROY FINANCIAL )<br>SERVICES, LLC and PHILLIP )<br>WASSERMAN, )<br>)<br>Defendants. )<br>                                                                       ) | Case No. 05-2153-JAR |

## MEMORANDUM AND ORDER

This is a contract claim concerning a lease for a Cessna Citation II airplane. Plaintiff brings a claim for breach of contract, and defendants counterclaim for breach of contract or rescission based on fraudulent inducement or alternatively, for plaintiff's failure to perform under the agreement. On January 8, 2008, the Court heard the evidence during a bench trial, and the parties subsequently submitted proposed findings of facts and conclusions of law. The Court has reviewed the evidence and each party's objections, and is prepared to rule. For the reasons detailed below, the Court finds that defendants breached the contract and are thereby liable to plaintiff to the tune of $118,400.90.

**I.    FINDINGS OF FACT**

- **The Parties**

Plaintiff Dr. William Reed ("Reed") is an orthopedic surgeon. He began flying airplanes at age twenty-one. Dr. Reed has received his commercial pilots license, enabling him to fly commercial jets. He bought the Cessna Citation II, the plane at issue, in 1999. The Cessna Citation II is a jet aircraft, which Reed used in his business, the Heartland Spine Hospital. Prior

to buying the aircraft, Reed had experience flying these types of turbo jet aircrafts as a pilot in the United States Air Force. Defendant Phillip Wasserman ("Wasserman") is an attorney turned financier. He practiced law for ten years before starting his own financial business, in which he travels throughout the country promoting defendant Phillip Roy Financial Services, LLC ("PRFS").

- **Contract Negotiations**

Throughout the negotiation process, Mark Jones of JetLease acted as a broker in the deal. Jones had worked with Reed in the past and knew that he had a plane up for lease. Jones contacted Reed to inform him that he had an interested party. Reed acknowledged the plane was available and gave the go ahead to begin negotiations. PRFS accepted Jones as the broker for the deal and paid JetLease $5000 for its services. Reed reimbursed JetLease for expenses incurred in the leasing process.

Jones proffered to both parties a preliminary lease agreement so that both parties could make changes and then submit the lease for final negotiations. Throughout lease discussions, Jones spoke with Wasserman and John Casey, PRFS's pilot. Jones told Wasserman and Casey that the plane would be down or going through a phase I-IV[1] inspection; however, Reed would want an agreement signed before he would conduct the phase inspections because of the expense. Jones also discussed with Casey the need for the plane to be equipped with Terrain Aviation Warning System ("TAWS") by the end of March 29, 2005, and Reduced Vertical Separation Minimum ("RVSM"). In addition, the need for the TAWS installation was written

---

[1]The phase I-IV inspections are routine examinations of the plane required under Cessna's guidelines. These inspections require disassembly of certain areas of the plane and checking for airworthiness and other issues.

into the acceptance certificate.

The TAWS was required by Federal Aviation Administration ("FAA") regulations to be installed in any plane that would be flown over a certain altitude. The plane at issue flew higher than such altitude, triggering the requirement that TAWS be installed. When the FAA mandates a new regulation, the details of that new regulation would, from time to time, be published in a variety of popular aviation magazines. Furthermore, any pilot receiving training on an aircraft that required the TAWS would inevitably know that the TAWS needed to be installed. In addition to the widespread publicity surrounding the installation of TAWS, most maintenance and industry mechanics were familiar with the need for the equipment on certain planes. Jones sent a preliminary agreement to PRFS and Reed. Reed discussed with his attorney the need to disclose in the agreement that the TAWS needed to be installed by March 29, 2005. Although a draft agreement indicated that TAWS was required by FAA regulations by March 2005, the final agreement did not contain the deadline for the installation, even though it did provide for the expected expenditure for the installation in the acceptance certificate.

Jones spoke with Casey on a number of occasions to let him know that the TAWS needed to be installed. The parties, in anticipation of the down time associated with the TAWS installation, discussed a side agreement in which JetLease would provide PRFS with a substitute aircraft once the Cessna Citation II went into the shop for the TAWS installation. In the lease agreement, the parties discussed the cost associated with the TAWS installation. On December 1, 2004, PRFS transferred $22,958.45 to JetLease. PRFS also had a credit with JetLease in the amount of $11,541.55 from a former lease. Of that amount, $14,750.00 was rent for January and another $14,750.00 was a deposit on the Cessna Citation II.

- **The Lease**

On summary judgment, this Court concluded that the lease agreement was ambiguous and that testimony regarding the parties' intent would be beneficial in explaining the contract terms. In its Summary Judgment Order, the Court determined that the contract was ambiguous as to which party was responsible for certain maintenance work, including overhauls and engine work. During trial the Court heard a substantial amount of evidence from both parties explaining that Reed was responsible for maintenance on engines and other major work, while PRFS was responsible for making its maintenance reserve payments in accord with the agreement. The following is the Court's findings of fact.

The parties signed the lease agreement on December 29, 2004, the date the plane was delivered to PRFS in Sarasota, Florida. Included at the signing was exhibit A, detailing the aircraft equipment, and exhibit B, the Aircraft Acceptance Certificate. The lease term was from the date of signing to November 30, 2005. The lessee, PRFS, agreed to make twelve payments in the amount of $14,750, totaling $177,000. Each rent payment was due on the first day of each month. In addition to the base rent, PRFS was obligated to make engine reserve payments in the amount of $220 per flight hour on the first day of each month. Engine reserve payments were to be used for payment of scheduled and unscheduled engine maintenance. Additionally, PRFS was obligated to make airframe reserve payments in the amount of $235 per flight hour. Again, this amount was due on the first day of each month and was to be paid with the base rent. Airframe reserve payments were intended for use in airframe maintenance.

Article 8.1 of the lease agreement provided that the lessee was in operational control of the plane. This meant that the lessee was responsible for operation, possession, use, and

maintenance.  The lessee was obligated by this section to keep the aircraft and systems fully functional and airworthy, including all directives, FAA regulations, and mandatory service bulletins.  The lessee was required to keep a flight log of the hours logged on the plane, engine, and airframe according to FAA regulations.  In section 8.4, lessor agreed that it was responsible for all maintenance on the aircraft engines, apparently in accordance with the payment of the engine reserves.

Article 10 of the lease agreement references default.  Section 10.1 provides that the lease is breached if lessee fails to make any payment under the lease when due, including the base rent and engine reserves, but not including the airframe reserves.  The lease agreement is breached by lessee if lessee fails to meet any covenant under the agreement, which failure is not remedied within ten days after getting written notice.

Article 11 provides the remedies for lessor in the event of breach by lessee.  Upon breach, lessor can: (1) declare the entire amount of the remaining base rent due under the agreement; (2) charge lessee interest of greater than 15% or the maximum amount allowed by law; (3)  recover all out-of-pocket costs associated with enforcing lessor's right to action, including attorney's fees; (4) and cause lessee to return the plane.

Section 14.2 of the lease agreement states that the owner and lessee are required to maintain the aircraft maintenance records in accordance with FAA regulations.  That section further provides that the lessee is in operational control of the airplane according to FAA regulations and that the operator of the plane can obtain "an explanation of the factors bearing on operational control of pertinent Federal Aviation Regulations" from the nearest FAA Flight District office.

The Aircraft Lease Acceptance Certificate consists of three paragraphs: one regarding the delivery of the plane, another regarding insurance acquired by the lessee, and a third noting that RVSM and TAWS installation are to be performed at lessee's choosing and at a cost pre-approved by the lessor.  The acceptance certificate also states that the phase V inspection is due in May, 2005.  The certificate was signed by both parties upon delivery of the aircraft.

- **Delivery**

Reed arrived in Sarasota, Florida to deliver the plane.  Upon arrival, he expected to see Wasserman and Casey to accept the plane, but only Casey was present.  Casey called Wasserman; and Wasserman assured Reed that Casey was his agent and more than capable of inspecting the plane and signing on PRFS's behalf.  Casey and Reed then inspected the plane and spent some time discussing the characteristics of the plane.  Casey informed Reed that he would need to be certified to fly the aircraft.  The two men also discussed the upcoming phase V inspection and the approaching installation deadline for TAWS, as well as the time required for the installation of RVSM.

Reed told Casey that he had obtained quotes for the installation of TAWS at two separate avionics shops in Kansas City, and that it would take a few days for the installation to take place. Casey suggested having one of the avionic shops at the Sarasota airport install the hardware; that way, PRFS would not lose the plane for more time because of the flight to Kansas City.  After going over some of the equipment with Casey, Reed climbed in the passenger seat and Casey and a co-pilot flew Reed back to the airport to catch a domestic flight to Kansas City.  While

landing the plane, Casey experienced a hard landing,[2] causing Reed some concern. Reed explained to Casey that the Citation II was different from the larger planes Casey had flown and that he needed to get closer to the runway before touching down. Unlike a 747, flying a Citation II required flying closer to the runway before touching down, while a 747, or a larger plane requires touching down when the pilot's view is approximately 50-75 feet off the ground.

- **Following Delivery**

After receiving the plane in late December, PRFS retained operational control of the plane. PRFS had the plane detailed and prepared, for training of its pilot, Casey. Because Casey was not licensed to fly the Citation II, he trained for a substantial amount of time in January 2005. According to the flight logs recorded for the last few days of December and the entire month of January, the plane was flown just over forty hours. This flight time included training time accumulated by Casey. PRFS then began to experience problems with the tires, landing gear, and certain lights within the plane. The lights were easily fixed with a few hours of labor. PRFS contacted Reed and Jones to resolve the landing gear and worn tire issues. Reed was surprised that the tires and landing gear were worn within a month because he had obtained a phase I-IV inspection, completed just days before delivery of the aircraft, and the mechanics doing that inspection would have undoubtedly found that the tires needed to be changed and that the landing gear was defective. Reed thus believed that the tires were worn because of mistreatment of the aircraft and the landing gear was damaged because of hard landings.

As a result of the issues with the landing gear and tires, PRFS did not pay the base rent

---

[2] Hard landings occur when the plane is dropped from the air at a distance too high to land, causing damage to the tires. For example, a pilot flying a 747 would need to drop the plane speed from a higher altitude to land the plane while a pilot in a Cessna Citation would need to get closer to the ground before reducing air speed and touching down.

for February on time nor did it pay the reserve payments because Reed had not fixed the tires. Reed did not immediately repair the tires because he suspected that the plane was being flown negligently, which caused the damage to the tires and lead to the damage to the landing gear. Eventually, Reed replaced the tires and the base rent was paid on February 14, 2005, after the ten day grace period written in the contract. Reed sent Wasserman another bill for the reserves, which was not paid until March 1, 2005.

Meanwhile, in late February 2005, Casey left the employ of PRFS and a new pilot, Jack Key was employed. When Key came on board, he advised Wasserman that the plane was not airworthy because there were issues with oil leaks by the landing gears. Key also advised Wasserman that the plane would not start without a Ground Power Unit ("GPU"). While the lease agreement provided that the plane be started every time with the GPU, it should not have been a necessary tool. Reed believed that the battery had been abused and that PRFS's failure to use the GPU with every start weakened the battery of the plane and taken a toll on the electric components of the plane.

In addition, Key was unable to locate all of the maintenance records of the plane, which were necessary to learn the details of the plane's history. After Key notified Reed of the issues with the plane, Reed contacted avionic mechanics at BizJet; and BizJet's mechanics flew to Sarasota to perform the repairs on the plane. In addition, Reed told Key that the records were maintained at CESCOM, a repository for Cessna aircraft records. Because FAA regulations require aircraft records to be kept up-to-date, Cessna plane owners usually use, though not required, the CESCOM repository to maintain the records. In this case, the records were not updated on the CESCOM system; the mechanics that worked on the plane prior to delivery failed

to upload the information to the CESCOM repository.  When Key requested the CESCOM records, the mechanics had to first upload the information onto CESCOM before delivering the complete CESCOM records.

Wasserman contacted Reed and Jones by email, advising them that the plane was deemed unairworthy by PRFS's pilot because he was unable to examine the CESCOM records.  In his correspondence, Wasserman explained that if the plane received its proper maintenance, PRFS would pay the reserves and rent for March, but not until then.  In response, Reed and Jones spoke of obtaining the records and having the mechanics upload the information onto CESCOM.  Reed contacted Air Associates, an airplane maintenance facility in Kansas City, Kansas, where the plane was previously maintained.  Air Associates told Reed that certain parts of the inspection were not recorded with CESCOM.

By March 11, 2005, the plane was stationed at Westcoast Aviation Services in Sarasota, Florida, saddled with problems with fuel leaks, landing gear, and airplane battery; and certain wires and hoses in the engine also needed to be separated.  After being notified of the necessary repairs, Reed reluctantly gave his permission to have the issues repaired.  While the plane was in the shop at Westcoast, Reed also inquired into having the TAWS installed at that time.  The plane remained in the shop until March 23, 2005, after which, PRFS used the plane to fly throughout Florida, including flights on March 30 and 31, 2005, all in violation FAA regulations mandating TAWS installation.  Not withstanding the issues with the plane, the plane was operated thirteen days in February, sometimes more than twice per day, and four times in March.  The March rent and reserves were never paid.  On April 26, 2005, Wasserman sent a letter to Reed repudiating the lease agreement.  In the letter, Wasserman explained that the plane was not

operational for the majority of March, and that because the plane was delivered without TAWS and TAWS was yet to be installed, the plane could not be flown. Consequently, Wasserman considered the lease "fatally breached."

- **After April 26, 2005**

After receiving the letter, Reed flew to Florida to recover the plane. He found the plane, acquired a ferry permit[3] to fly the plane, and had the RVSM and TAWS installations completed. Reed then began searching for a buyer for the plane. Once a buyer was found, the plane went through an extensive "pre-buy" maintenance check. During the maintenance check, mechanics at Kansas City Aviation Center found over 340 "squawks."[4] The problems were attended to and the plane was subsequently sold for $1,560,000. At the closing, Reed allocated funds to pay the lien on the plane for fuel used at Dolphin Aviation in Florida. The sale closed on November 7, 2005.

## II.  DISCUSSION

### A.  Breach of Contract

Both parties bring claims for breach of contract. To prove a breach of contract, a proponent must prove by a preponderance of the evidence that (1) there was a contract between the parties, (2) there was sufficient consideration to support the contract, (3) the proponent was willing to comply with the terms or did comply with the terms of the contract, (4) the other party

---

[3] A ferry permit is required by the FAA to fly a plane that is not certified under FAA regulations. Here, one was required because the plane was not TAWS certified.

[4] A squawk is a problem with any part of the plane, ranging from a frayed seatbelt to airworthy issues such as oil leaks. In this case, as of September 2005, there were over 340 squawks, two-thirds of which Reed thought were airworthy issues.

breached the contract, and (5) proponent sustained damages.[5]

Reed claims that PRFS breached the contract by failing to make the monthly lease payments and by failing to make the reserve payments, while PRSF claims that Reed breached the contract by providing a plane that was defective in material respects. The lease agreement provided for lease payments to be paid the first of each month with a ten day grace period and for reserve payments to be paid in accordance with the amount of hours the plane was flown for the previous month.

Here, the preponderance of the evidence shows that PRFS failed to make the February reserve payments on time, not to mention never paying the March reserve payment and March rent.[6] PRFS claims that there was a material breach because the plane was not airworthy during most of March. However, that does not excuse the breach for failure to pay the February reserves until mid-March.

PRFS asserts that Reed breached the agreement by failing to provide the money for maintenance. However, the preponderance of the evidence shows that Reed was in compliance with the agreement. As lessor, Reed was required to perform maintenance with monies paid to the reserves. It is undisputed that PRFS failed to provide the February reserves until March, leaving Reed with less money to provide maintenance work.[7] Moreover, the work that was to be done on the plane in March began in early March when Reed consented to having the plane go

---

[5]*City of Andover v. S.W. Bell Tel., L.P.,* 153 P.3d 561, 565 (Kan. Ct. App. 2007).

[6]*See N.W. Arkansas Masonry, Inc. v. Summit Specialty Prods., Inc.*, 31 P.3d 982, 985 (Kan. Ct. App. 2001) (noting that a "breach of contract occurs when there is a failure of performance of a duty arising or imposed by agreement.").

[7]*See Lassiter v. Topeka Unified Sch. Dist. No. 501*, 347 F. Supp. 2d 1033, 1041 (D. Kan. 2004) (explaining that a party is expected to perform his promise where there has been an uncured material breach by the other party).

through maintenance at Westcoast Aviation. As Reed was obligated to make payments for the maintenance of the plane while it was in the shop, PRFS was responsible to make the monthly lease payments, which it did not do for March. As a result, PRFS breached the agreement between the parties.

### B.     Rescission

Under Kansas law, "the right to rescind a contract does not arise from every breach."[8] "To warrant rescission of a contract for breach of contract, the breach must be material and the failure to perform so substantial as to defeat the object of the parties in making the agreement."[9] If a breach is incidental or subordinate to the main purpose of the contract, rescission is not warranted.[10] The issue presented in this case is whether the failure of Reed to provide the TAWS installation deadline in the lease agreement and the CESCOM records immediately upon request is a material breach, which goes to the heart of the agreement.

PRFS claims that Reed induced the signing of the contract through fraud by failing to provide the installation deadline for TAWS, and as a result, it should be able to rescind the agreement. To establish fraud by silence, PRFS must show by a preponderance of the evidence:

> (1) that defendant [in this case Reed] had knowledge of material facts which plaintiff [PRFS] did not have and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of

---

[8]*City of Shawnee, Kan. v. AT&T Corp.*, 910 F. Supp. 1546, 1552 (D. Kan. 1995).

[9]*Fed. Land Bank of Wichita v. Krug*, 856 P.2d 111, 115 (Kan. 1993).

[10]*City of Shawnee*, 910 F. Supp. at 1553.

12

defendant's failure to communicate the material facts to plaintiff.[11]

The evidence adduced at trial tends to show that PRFS could have discovered the TAWS installation deadline through reasonable diligence. Accordingly, PRFS's fraud claim fails. The testimony of Jones, Reed, and Anthony Mateer, Director of Operation of the Kansas City Aviation Center, shows that the deadline for the installation TAWS was readily known throughout the industry. Additionally, the Court finds it difficult to believe that Casey did not learn of TAWS while he flew with an instructor throughout the month of January. Finally, Wasserman permitted his pilot to act as his agent in consummating the deal. Casey arrived to sign the delivery certificate and to inspect the aircraft, thereby asserting to others that Casey was informed of the regulations relevant in the industry. PRFS and Wasserman claim that they did not know of the deadline for the installation of TAWS. However, as explained in the lease agreement, PRFS was in operational control,[12] and as such was responsible for the upcoming regulations and duties mandated by the FAA. Furthermore, the testimony offered that PRFS's pilot was aware of the procedure negates its claim that it did not know of the need to install TAWS. Finally, the need for TAWS is written into the acceptance certificate, thus PRFS was aware that TAWS needed to be installed. And as the person in operational control of the plane, PRFS was obligated to be in tune with the deadlines associated with installation. Based on the evidence and the lease agreement, PRFS has failed to show that it was unaware of the deadline

---

[11]*McLellan v. Raines*, 140 P.3d 1034, 1040 (Kan. Ct. App. 2006) (quoting *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman*, 978 P.2d 922, 932 (Kan. 1999)).

[12]*See* section 14.12 of the Lease.

and that it was not obligated to learn the date for installation of TAWS.[13]

PRFS also claims that Reed breached the agreement by failing to provide the CESCOM records immediately upon request. The Court finds that the failure of Reed to provide the CESCOM records in the time requested by PRFS was not a material breach. PRFS argues that there was a material breach because the contract provides that the aircraft "has been maintained and inspected under F.A.R. 91." That section includes provisions requiring the owner of the aircraft to ensure that mechanics make updates to the plane's maintenance records.[14] Thus, because PRFS had to wait to get the records from Reed, it claims that there was a material breach.

Reed was informed of missing CESCOM records on March 7, 2005. He then contacted Jones and the past mechanics on March 8, 2005. The majority of the records for the past phase I-IV inspections were complete within one day. The remaining records were compiled and forwarded to CESCOM by March 22, 2008, hardly a substantial amount of time on an eleven month lease.[15] Furthermore, even if the Court was inclined to view the time as material to the lease agreement, the lease agreement does not mention a time period in which Reed would have to provide the maintenance records. The lease agreement simply requires the owner and the operator to maintain the plane according to FAA regulations. As such, PRFS is unable to show that rescission of the contract is warranted and is therefore, liable to Reed for breach of contract.

---

[13]The Court also notes that the agreement and acceptance certificate were signed on the same date, negating any concern that PRFS did not know about the installation of the TAWS and that it was under an obligation to first find out the due date for installation.

[14]F.A.R. § 91.405(b).

[15]*See Reynard v. Bradshaw*, 409 P.2d 1011, 1017 (Kan. 1966) (finding that a delay in performance is not grounds for rescission unless it seems performance is never intended).

C.     **Damages for Breach of Contract**

On summary judgment, the Court concluded that damages are governed by K.S.A. § 84-2a-528(1). Throughout the trial and in his proposed finding of facts, Reed contests this finding. The Court construes Reed's protest as a motion to reconsider under Federal Rule of Civil Procedure 60(b). Under Rule 60(b), the court may reconsider a judgment based on new evidence.[16] At trial, the Court learned the facts in this case and concluded that PRFS breached the agreement. Furthermore, both parties submitted evidence going to the intent of the parties when they formed the agreement. Accordingly, based on the evidence at trial, the Court amends its former conclusion and finds that damages are controlled by the contract rather than contract statute.

Reed calculates his damages as follows:

| | | |
|---|---|---|
| Lease Payments: | $14,750.00 x 5 months (March through July) | $73,750.00 |
| Engine Reserve: | $220.00/Flight hour | $5,170.00 |
| Airframe Reserve: | $235/Flight hour | $5,522.50 |
| Late Fees: | $1,475.00 x 5 months | $7,375.00 |
| Lien at Dolphin Aviation | | $2,156.96 |
| Total | | $95,449.46 |
| 15% annual interest from July 1, 2005 | | $41,312.06 |
| Total | | $136,761.52 |

Reed has failed to prove the damages for both the engine reserve and the airframe reserve. During trial, Reed advanced a convoluted formula used in determining the hours

---

[16] Fed. R. Civ. P. 60(b).

accumulated on a plane. However, that evidence was unconvincing and the Court cannot place any weight on that evidence. Accordingly, the Court finds that Reed was damaged in the amount of $73,750.00 for the breach of the lease agreement. The Court further finds that Reed is damaged in the amount of $7,375.00 for accumulated late fees for five months. As to the lien at Dolphin aviation, Reed provided an invoice of sale to substantiate that claim. Accordingly, that $2,156.96 gasoline bill is added to the total damages. The total damages awarded are $83,281.96, plus the accumulated interest of 15% annually since July 1, 2005. In sum, Reed is due $118,400.90.

The lease agreement also provides for attorney's fees. Section 11.1(d) states that lessor, upon lessee's default, may recover "all out-of-pocket expenses . . . including reasonable attorneys fees, paralegal expenses and court costs . . . ." Consequently, the Court finds that Reed is entitled to attorney fees. Although Reed submitted a lump-sum figure of $65,180.53 for services provided in this matter, counsel has not provided the Court with any documentation as to the amount or propriety of the fees. Counsel should submit a detailed accounting of the attorney's fees and expenses.

### D. Motion to Conform Pleadings and Pretrial Order

"As a precautionary measure," defendants have moved for an order to conform the Pretrial Order (Doc. 147) to the evidence and facts elicited at trial. Under Federal Rule of Civil Procedure 15(b), "[w]hen issues not raised by the pleadings are tried by express consent or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." A motion for such an amendment may be made at any time, even after judgment,

and should be freely given.[17]

Defendants argue that issues regarding the CESCOM records and FAA regulations requiring maintenance of those records are mentioned in the Pretrial Order and were issues correctly raised at trial. Even if they were not raised in the Pretrial Order, defendant insists the issues were raised on summary judgment and resolved at trial. Thus, the issues were tried by the implied consent of the parties. Plaintiff argues that allowing defendants to amend the Pretrial Order now would cause considerably prejudice because defendants are essentially asserting new defenses.

The motion is granted. First, the Court notes that plaintiff has argued these issues on summary judgment. In fact, these issues were significantly important in the Court's decision on summary judgment. Second, defendants presented evidence during trial to support its contention that the records were not available and plaintiff presented evidence to rebut the same. And indeed, the Court decided on those issues in this final Order. Third, the issues were raised in the Pretrial Order, even if not as affirmatively as they were raised on summary judgment and at trial. Consequently, because the issues raised and addressed were done by the implied consent of the parties, they will be treated as a part of the Pretrial Order. Defendant's motion is therefore granted.

**IT IS THEREFORE ORDERED THAT** PRFS is in breach of the contract and is liable to Reed in the amount of $118,400.90 plus reasonable attorney fees.

**IT IS FURTHER ORDERED THAT** counsel for Reed shall submit documentation regarding attorney's fees and expenses within ten (10) days of the date of this Order.

---

[17]Fed. R. Civ. P. 15(b).

**IT IS FURTHER ORDERED THAT** Defendants' Motion to Conform Pleadings and Pretrial Order to the Evidence at Trial (Doc. 183) is Granted.

**IT IS SO ORDERED.**

Dated this  28th  day of April 2008.

  S/ Julie A. Robinson
**Julie A. Robinson**
**United States District Judge**